[Civ. No. 2075.   Fourth Appellate District.—May 25, 1938.]

OSCAR CROWELL et al., Plaintiffs and Respondents, v. CITY OF RIVERSIDE (a Municipal Corporation) et al., Defendants and Respondents; ROMAN WARREN, Appellant.

A. Heber Winder for Appellant.

Sarau & Thompson for Plaintiffs and Respondents.

Best & Best and James B. Ogg for Defendants and Respondents.

HAINES, J., *pro tem.*—On January 2, 1934, W. C. Evans and wife, and Citizens National Trust and Savings Bank, a corporation, executed to the City of Riverside, a municipal corporation, a lease for a term of five years, of about 80 acres of land owned by the lessors in Riverside County, at a rental of $1 a year. The lease provided that "said property will and may be used only for the purpose of maintaining and providing an airport and facilities for the accommodation of, manufacture, sale, and renting of aircraft and other appurtenances and accessories". It was also stipulated that the buildings and improvements thereon "do not belong to the lessors and are not included in the lease". The lessee, while not in default, was given the optional right to purchase the land for $37,500. The lease contained a clause to the effect that:

"It is further understood and agreed that no sublease will be made of this property by lessee to anyone without written consent thereto by lessors, it being a consideration of this lease that a sublease is being made to Roman C. Warren."

It also provided that if the lessee should default in any of the covenants to be performed on its part lessors might, at their option, in the event the default did not end within thirty days after written notice thereof, reenter, take possession of the premises and remove all persons therefrom. The lessee agreed, at the expiration of the term, or any sooner termination of the lease, to quit and surrender the premises to the lessors.

On the same day, January 2, 1934, the City of Riverside, on its part, executed a lease of the property to defendant and appellant, Roman Warren, for the same term and containing a like option to purchase the property for $37,500 while such lease should be in good standing. This lease contained an agreement in the same terms as the other respecting the use of the premises only for maintaining and providing airport

facilities. It omitted, however, any covenant against subletting.

On March 12, 1936, without seeking or obtaining the consent either of the lessors in the basic or original lease, or of his immediate lessor, City of Riverside, Warren executed what was in form a lease of the property and of an airplane hangar thereon to one Kenneth R. Brooks for a period of one year beginning April 1, 1936, Brooks covenanting to maintain it as an aviation field, and it being stipulated that ''said field shall be under the management of said party of the first part'', that is, Warren. Brooks, however, was to be allowed the exclusive use of the hangar.

On April 13, 1936, W. C. Evans and wife and the bank conveyed the southerly portion of said 80 acres, amounting to about 40 acres, or half of the whole, to the plaintiffs Oscar Crowell and Nellie B. Crowell. The Crowells, claiming that the basic or original lease executed to the City of Riverside by their grantors had been forfeited by Warren's sublease to Brooks, after having on May 21, 1936, in conjunction with the Evans and the bank, served the city with a notice of termination of the lease made to it, and after having, on June 1, 1936, served on appellant Warren a notice demanding possession of the property, on September 12, 1936, brought the present action in two counts, the first to quiet title to the said 40 acres and the second in ejectment against the City of Riverside, appellant Warren, and the said Brooks, as defendants, and obtained in the trial court judgment determining the forfeiture of the lease, awarding them possession of the property, and, as against appellant Warren, awarding them, in addition, $350 by way of damages for its detention. From this judgment defendant Warren alone has taken the present appeal.

Appellant's position is: (a) that the covenant against subletting appearing in the basic or original lease from the Evans and the bank to the City of Riverside was single and not continuing; that the city having, with permission of its lessors and by arrangement with them, coincidently executed the sublease to appellant Warren without any inhibition against subletting, he was under no such inhibition, and the subletting by him was no breach of the basic lease; (b) that the arrangement between appellant Warren and Brooks, though described as a lease, was in reality more in the nature

either of a license or a servitude upon Warren's leasehold rights, so that even if Warren were affected by the inhibition against subletting contained in the basic or original lease, he did not in fact breach it; (c) that whether the basic lease was technically breached or not, the case was not a proper one in which to declare a forfeiture; (d) that the trial court committed reversible error in excluding evidence that Warren continued, after making his agreement with Brooks, to act as manager of the premises; and (e) that the trial court committed reversible error in excluding evidence of such public interest in the enterprise as made it inequitable to declare any forfeiture.

The discussion in the briefs over the effect of the permission given by the lessors to the City of Riverside to sublet to Warren and the execution by the city to Warren of the sublease referred to has taken a wide range. Attention has been called to the rule laid down in England in what is known as Dumpor's case, 4 Coke, 119b (76 Eng. Reprint, 1110). This rule is epitomized in *Kendis* v. *Cohn*, 90 Cal. App. 41, 52 [265 Pac. 855], where it is stated to be:

"That a *condition* against assignment without the license of the lessor *is entire and cannot be apportioned* by the act of the parties; and that a license given and an assignment made pursuant thereto destroys the whole condition, leaving the assignee or any subsequent assignee at full liberty to assign the lease to whomever they please."

The rule is otherwise stated in *Easley Coal Co.* v. *Brush Creek Coal Co.*, 91 W. Va. 291, 301, 302 [112 S. E. 512, 516], referring to *Reid* v. *Wiessner Brewing Co.*, 88 Md. 234 [40 Atl. 877], as follows:

"When there is a condition in a lease against the assignment of the term without the consent of the lessor, and such consent is given to one assignment without any restriction as to future assignments, the condition is waived altogether and the assignee may assign the term without the consent of the lessor."

The history of this doctrine, as enunciated in Dumpor's case, with its subsequent fortunes in various jurisdictions, has been traced in *Kendis* v. *Cohn, supra,* pp. 51–53, and more elaborately in the Wyoming case of *Investors Guaranty Corporation* v. *Thompson*, 31 Wyo. 264 [225 Pac. 590, 32 A. L. R. 1071], and it would serve no useful purpose to here

enlarge upon what has in these cases been said about its lineage or vitality. It was, however, in *Kendis* v. *Cohn, supra,* said:

"It has long been settled that restraints upon the use or alienation of granted premises may within certain limits be lawfully imposed, which is a reasonable recognition of the owner's right to deal with property as he pleases, provided the restraints are not unlawful or against public policy (*Broadway Bank* v. *Adams,* 133 Mass. 170 [43 Am. Rep. 504]; *Nichols* v. *Eaton,* 91 U. S. 716 [23 L. Ed, 254]; see, also, Rose's U. S. Notes). Consequently, covenants against assignment of a lease without the written consent of the lessor are regarded as fair and reasonable. The lessor may place any restriction within these limits on the right of the lessee to select his tenant for him (*E. H. Powers Shoe Co.* v. *Odd Fellows Hall Co.,* 133 Mo. App. 229 [113 S. W. 253]). The rule in Dumpor's case contravenes these rules of law and denies the lessor the right to select his own lessee and protect his reversionary estate. The rule in Dumpor's case has virtually been overturned by another doctrine established in regard to conditions. This is the doctrine of continuous conditions, which has long been applied both in this country and in England."

As applied to assignments of leases, we understand this doctrine of single or continuous conditions to mean substantially this: that where a lease contains a covenant by the lessee not to assign without the lessor's permission and provides that a violation thereof shall entail a forfeiture, but such covenant is not, in terms, stated to be binding on the lessee's assigns, or on the lessee's heirs, successors and assigns, there the covenant is said to be *single,* that is, to inhibit no assignment other than one by the lessee. In such a case, therefore, if the lessee obtains permission to assign, and does so, his assignee is under no inhibition to make further assignments because the original lease only inhibits the original lessee from assigning and does not by its terms inhibit his assignee from doing so. (*Chipman* v. *Emeric,* 5 Cal. 49 [63 Am. Dec. 80]; *German American Sav. Bank* v. *Gollmer,* 155 Cal. 683 [102 Pac. 932, 24 L. R. A. (N. S.) 1066].) Since a single assignment divests the lessee of any interest susceptible of being assigned, the inhibition personal to him against assigning, said to be single, has exhausted its force.

■ On the other hand, when, by the terms of the original lease, the covenant not to assign without the lessor's consent is expressed as binding the lessee *and his assigns,* or the lessee, *his heirs, successors and assigns,* and the lease provides for a forfeiture in the event the covenant is broken, there an assignment by the lessee, pursuant to permission obtained from the lessor, does not free the assignee from the binding force of the condition, for, although the assignee is without privity of contract with the lessor, he does yet deraign title to the leasehold through the original lease and is, therefore, in privity of estate with the lessor (15 Cal. Jur., pp. 753, 754, and cases cited), and by the terms of the original lease the assigns or heirs, successors and assigns, as the case may be, of the original lessor, are, on pain of forfeiture, expressly forbidden to assign. In these circumstances the inhibition against assignment is said to be continuous and to run with the land, and therefore not to be vitiated by permission to the lessee to make any particular assignment except as to that assignment only. (*Easley Coal Co.* v. *Brush Creek Coal Co., supra,* citing *Williams* v. *Earle,* L. R. 3 Q. B. 739; *Roe* v. *Harrison,* 2 T. R. 425; *Jackson* v. *Groat,* 7 Cow. (N. Y.) 285, 16 R. C. L., p. 838 and 18 Am. & Eng. Ency. of Law, 662; see, also, *Kendis* v. *Cohn, supra.*)

The pervading distinction adverted to between single and continuous conditions, while implicit in the earlier California cases, seems first to have been given emphasis in this state in *Kendis* v. *Cohn, supra.* An application in that case for a hearing in the Supreme Court was denied.

■ The instant case, however, is not one of an assignment of any lease. It is one of a sublease by the City of Riverside to Warren, and the further sublease by Warren to Brooks.

There has been a pretty general understanding, even where Dumpor's case has been recognized as law, that its doctrine is inapplicable to subleases and it was said in *Kendis* v. *Cohn, supra* (p. 54), that:

"It is well settled that the waiver of a condition as to one subletting does not discharge the condition (*Goodwin* v. *Grosse,* 56 Cal. App. 615 [206 Pac. 138] ; *Miller* v. *Newton-Humphreville Co.,* (N. J. Ch.) 116 Atl. 325; *Doe* v. *Bliss,* 4 Taunt. 735; *Farr* v. *Kenyon,* 20 R. I. 376 [39 Atl. 241] ; *Seaver* v. *Coburn,* 10 Cush. (Mass.) 324; *Harmon* v. *Dickerson,* (Mo. App.) 184 S. W. 139)."

We do not understand that counsel for appellant disputes the propositions just enunciated, in so far as they have to do with the assignment of leases, but he does dispute the proposition that a covenant may not also be single as respects the agreement not to sublet. We agree with him that the circumstance that the sublessee is charged by the law with notice of the terms of the basic lease (*Baranov* v. *Scudder,* 177 Cal. 458 [170 Pac. 1122], *Pedro* v. *Potter,* 197 Cal. 751 [242 Pac. 926, 42 A. L. R. 1165], *Coalinga etc. Co.* v. *Associated Oil Co.,* 16 Cal. App. 361 [116 Pac. 1107], and *Georgeous* v. *Lewis,* 20 Cal. App. 255 [128 Pac. 768]) is no aid in that inquiry, for the fundamental question is not what the sublessee is charged with knowing about the terms of that lease, but, rather, what those terms, under the law, mean. Counsel's position, however, is that in respect to covenants against subletting, equally with covenants against assignments, the covenant may be either single or otherwise, according as it is so written as to be personal to the lessee; or, contrariwise, is stated to be on behalf of himself ''his heirs, successors and assigns'' or there is contained in it some expression to that effect. So far as the California precedents are concerned, his reliance appears to be on what he conceives to be the reasoning in *Miller* v. *Reidy,* 85 Cal. App. 757 [260 Pac. 358], and of *Kendis* v. *Cohn, supra,* both of which, according to his contention, substantially argue that, so far as the difference between covenants that are single and covenants that are not is concerned, subleases and assignments stand on the same basis. With respect to this contention it is first to be observed that *Miller* v. *Reidy, supra,* was purely an assignment case and involved no question of sublease, and could, therefore, be no authority for or against any such proposition as counsel asserts as applying to subleases. *Miller* v. *Reidy, supra,* does not in any way mention the subject of subletting otherwise than (top of p. 760) to refer to a notice given by the lessors as complaining of ''subletting'', while the context shows what they really complained of was an assignment. In *Kendis* v. *Cohn, supra,* on the other hand, the facts were that the original lessors, the Cohns, executed to the lessees, the Barkers, a lease wherein the lessees covenanted not to assign or sublet without the consent of the lessors. The lease included the following clause:

"This lease and all its covenants, agreements and conditions shall bind said lessors, their heirs, executors, administrators, and assigns, and shall bind said lessees, their heirs, executors, administrators and successors, and also their assigns, in case of an assignment of said lease by and with the written consent of the lessors."

The Cohns and the Barkers coincidently executed a separate writing whereby the former agreed to accept Mrs. Kendis as "sublessee" of the Barkers, provided that she should observe all of the covenants of the original lease on pain of forfeiture of her rights. At substantially the same time, the original lessees, the Barkers, and Mrs. Kendis, entered into a mutual agreement consisting of a third document, variously interpreted as an assignment or a sublease from the Barkers to Mrs. Kendis, by the terms of which she expressly agreed to observe the terms of the original lease from the Cohns which was referred to and by reference made a part of this document. By a fourth document, to which the Cohns were not parties, and of which, so far as appears, they knew nothing until later, the Barkers undertook to permit Mrs. Kendis to assign her rights without obtaining anyone's consent. Subsequently, the Barkers released all their interests under the original lease to the original lessors, the Cohns. Thereafter, Mrs. Kendis sought to assign her rights to one Roberts, and the litigation before the court involved her claim of right to do so. While the parties had described the document under which Mrs. Kendis held as a sublease, the trial court considered it to be an assignment from the Barkers. The appellate court, though recognizing some difficulty in determining which it was, and referring to it in some portions of its opinion as an assignment, thought on the whole that it amounted to a sublease (p. 59). The court went on to say, however, that, in the circumstances, the condition against subletting being a continuous covenant, its waiver as to one subletting did not discharge the condition, and said further:

"It follows, therefore, whether the instrument in question be an assignment or a sublease, the same result obtains, and while respondent has the right to quiet and undisturbed possession of the premises under the terms of the lease upon complying with its terms, she would not be licensed to assign or sublet without the consent of appellants."

We are unable to see that this case can afford any real authority either for or against appellant's contention that there may be such a thing as a covenant against subletting which is not continuous. The court had no actual occasion to decide any such question, since Mrs. Kendis had agreed to abide by the original lease.

In *Goodwin* v. *Grosse,* 56 Cal. App. 615 [206 Pac. 138], a lessee under a lease which contained a covenant that, so far as is stated in the opinion, appears to have been personal to him, forbidding subletting without the lessor's consent, on pain of forfeiture, had sublet part of the leased premises, as he claimed, by permission of the lessor's agent. Since the trial court had found, as a fact, that no such permission had actually been given, the appellate court was not really required to decide whether, if it had been given, it would have done away with the inhibition against making a second sublease or not, and therefore the case can hardly be said to be authority one way or the other on that subject. Nevertheless, it was said in substance that even though he were given such permission to make one sublease, that would not destroy the continuing effect of the covenant and condition, to forbid the making of another.

For our present purposes, however, we do not believe it necessary to decide whether the distinction ordinarily assumed to exist in leases between covenants and conditions not to assign and covenants and conditions not to sublet, as respects their running with the land, ought finally and definitively to be held to be law in this state or not, for in the instant case there exist circumstances that, independently of what may be held to be the general rule, characterize the particular covenant against subletting here involved, as upon its face, intended to apply as a condition to appellant Warren. One of these circumstances is that the covenant not to sublet is, as has been seen, made not only in the same document, but as a part of the identical sentence in which it is stated that it is ''a consideration of this lease that a sublease is being made to Roman C. Warren''. Manifestly, the covenant and condition against subletting was either entirely nugatory, which cannot be assumed to have been the intention, or else it was intended to inhibit some other subletting than the subletting to Warren. The scope of the sublease to Warren is not, in the language quoted, limited in any way, and it

is a sublease not permitted, merely, but required, by the language used. The inference is that it was intended in content and duration to be coextensive with the original or basic lease, as in fact it turned out to be, in so far as its term, the property leased, and the rent reserved were concerned. Another circumstance is that the purpose of the basic lease very definitely appears from its terms to have been to provide for an airport, and this, coupled with the requirement, just adverted to, that a sublease be executed to Warren, strongly indicates that what the lessors had in view was an airport to be operated by Warren. In these circumstances it is tolerably plain from a mere inspection of the basic lease, that the intention was to employ the city as an instrumentality, largely nominal, for installing Warren as the real lessee. Why the city's intervention should have been desired at all does not, of course, appear on the face of the documents, though it is claimed that in fact what was wanted was government aid for the airport which could only be had if the city allowed its name to be used. However that may have been, the obvious intent of respondents' grantors that Warren should conduct the airport was served by the action of the city in immediately and, in fact, coincidently and as part of the same transaction, making the sublease to him. What subletting, then, is it reasonable to believe that the original or basic lease was intended to forbid, unless done with the written consent of the original lessors? The language used indeed is "no sublease . . . by lessee . . ." This might conceivably have been intended merely to apply in the contingency that Warren should throw up his sublease and occasion should arise for the city to substitute another sublessee in his place. But even if we take the situation only as disclosed on the face of the basic lease, without reference to anything extrinsic to that, it still seems to us more natural to believe that the expression "lessee", in the covenant against subletting thus appearing, was in this instance intended to include Warren, as the intended occupant and real tenant, as well as the city. Treating it as carrying that meaning, and having in mind that, as already noticed, Warren is charged by the law with notice of its terms, we have no hesitation in holding that, whether or not an inhibition against subletting, when made a condition, can generally be said to run with the land, that for practical purposes was the effect of this one, so far

as he was concerned. It must, then, be considered and held that, in this case, Warren was required, on pain of forfeiture, to refrain from subletting.

We are thus brought to the next of appellant's principal contentions, namely, that his arrangement with Brooks was not in fact a sublease. The instrument involved is in evidence. It purports to be a lease for one year with certain privileges of extension, of "the right to use for commercial flying and aircraft services subject to all conditions hereinafter set forth" the 80 acres or thereabouts already referred to, which it proceeds to describe; "together with the airplane hangar thereon located". It reserves the rental to be paid by Brooks to Warren in monthly instalments. It contains a covenant on Brooks' part not to underlet or assign the lease. It contains, *inter alia,* further clauses as follows:

"It is further agreed that the aviation field located upon said real property shall, at all times, remain open to all aviators, including the party of the first part, as a public airport and without pay or rent, subject to the rules and regulations of the United States Department of Commerce and second party hereby agrees to observe said rules and regulations as well as all statutes, rules and regulations of all public agencies and of all branches of federal, state and county government. Said field shall be under the management of said party of the first part. Any such aviator may make temporary repairs to any ship upon said field without rent or pay for use of said field.

"It is further agreed that said second party assumes each and every liability for damages arising from the said use of said field, save those caused by negligence of first party, and second party agrees to save first party harmless from such damages.

"It is further agreed that second party shall have the full and exclusive use of said hangar."

We are not able to agree that this instrument amounts merely to a license or, at the most, to some sort of a servitude on the premises involved, though it may have some of the characteristics of both. Undoubtedly the retention by Warren of the right to manage the aviation field is a somewhat anomalous feature in a lease and curiously inconsistent with Brooks' assumption of liability for all damages arising from the use of the land as such aviation field other than such as

might be caused by negligence on Warren's part. Exactly what Warren's rights and duties as manager were to be is not defined, neither does it very clearly appear how much personal activity on Brooks' part is implied in the right given to Brooks to "use" the property for "commercial flying and an aircraft service", but it must, we take it, be considered that the terms of the instrument, though it contemplated that the airport should be open to aviators generally "without pay or rent", subject to government regulation, yet entitled him to collect and retain for his own use and benefit, subject only to the obligation to keep up his rent payments to Warren, all charges which might, under the terms of the instrument, be made for any services to be rendered to aviators or others using the field. Moreover, despite counsel's suggestions to the contrary, it is as much a subletting to sublease part of a property as the whole (see e. g. *Goodwin* v. *Grosse, supra*); and Brooks was given the exclusive right of occupancy of the hangar, which necessarily involved the ground on which the hangar was located. Certainly as to that it cannot be argued even with plausibility that the arrangement was not a sublease. Taking the instrument as a whole, we think its dominant character to be that of a sublease, notwithstanding the reservation, whatever that may have amounted to, of Warren's right of management. The instrument is at least too broad in its terms to amount merely to a license, nor do we think it was a mere easement. For that matter, however, even if all that were sublet were an easement in gross, it might be a question whether its creation would not be to that extent a forbidden subletting. ■ An easement may be a freehold or a chattel real, according to its duration (*Appeal of North Beach & M. R. R. Co.*, 32 Cal. 499, 506); and is in either case an interest in real property. (*Corea* v. *Higuera*, 153 Cal. 451, 454, 455 [95 Pac. 882, 17 L. R. A. (N. S.) 1018].)

■ It is settled that where the breach of a condition consists of subletting, no notice requiring the performance of the covenant need be served since it is impossible for the one guilty of the breach not to do that which he has already done. (*Harloe* v. *Lambie*, 132 Cal. 133, 135 [64 Pac. 88].) The law does not require a vain act.

■ The next question is whether, even though it be conceded that the making of the sublease to Brooks was a breach

of a condition in the original lease from the plaintiff's grantors to the City of Riverside, the breach was of such a nature as to compel the enforcement of a forfeiture.

"In an action to declare a forfeiture because of an alleged default in a condition of a contract, the defendant may plead an equitable defense, seeking relief against the forfeiture, and this although the action brought is summary in principle and process. The very nature of the action involving, as it does, a forfeiture, is said to appeal to the equity side of the court and in turn requires a full examination of all the equities involved to the end that exact justice be done." (12 Cal. Jur. 641, citing *Gray* v. *Maier & Zobelein Brewery*, 2 Cal. App. 653 [84 Pac. 280], and *Knight* v. *Black*, 19 Cal. App. 518 [126 Pac. 512].)

In the last-mentioned case it was said (p. 524) :

"The trial court granted plaintiff's motion to strike out the essential parts of the quoted portion of the defendant's answer, upon the theory, apparently, that a literal compliance with the condition of the lease, notwithstanding that its breach involved a forfeiture, was absolutely essential to the life of the lease and the estate granted thereunder, and that a substantial compliance with the condition could not be pleaded or considered as a valid defense to the action.

"This, we think, was error, which subsequently and necessarily resulted in prejudice to the defendant by the exclusion of proffered testimony which would have been material and relevant to the issue presented by this defense."

An examination, however, of the authorities having to do with the subject of relief in equity against forfeitures discloses a very well-defined line of demarcation between those forfeitures against which equity will afford relief and those in which it refuses to do so. It is said in 1 McAdam on Landlord and Tenant (pp. 846, 847) : "Equity lies at the foundation of relief in the case of forfeiture, and good conscience is the beacon light that points the way out. Compensation is the panacea. . . .

"Equity will as a rule relieve against a forfeiture, where the breach is not willful, and where compensation can be made, or where the forfeiture is a mere security. . . .

"A court of equity may relieve a tenant from a forfeiture of the lease if the forfeiture was through inadvertence, acci-

dent or mistake, on such terms as may be just, but not where there is willful, voluntary, gross, or inexcusable neglect.''

In the same volume the author says (p. 848):

''Relief is generally confined to cases of covenant for the payment of money where the amount can be unquestionably fixed, and not to covenants to keep insured, and the like.''

Also that:

''Forfeitures for breach of covenant not intended merely as security for the payment of money will not generally be relieved against, for the reason that no exact compensation can be made.''

Also that:

''Among these covenants for a breach of which no relief can ordinarily be given is that to repair generally, or to make specific repairs, or to lay out a certain sum of money in repairs or erections within a specified time; the covenant to insure; the covenant not to assign without license; and in other covenants of a special nature.''

Manifestly a covenant not to sublet falls into this class.

In this state section 3275 of the Civil Code provides:

''*Relief in Case of Forfeiture.* Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty.''

''Willful'', as the word is used in this code section, is to be understood in its ordinary sense of ''spontaneous'' or ''voluntary''. (*Parsons* v. *Smilie*, 97 Cal. 647, 654, 655 [32 Pac. 702].) The breach in the instant case of the inhibition against subletting, which, as we have held, amounted to a condition by which appellant Warren was bound, was not one susceptible of being compensated in money. Indeed, since Warren had not covenanted that he would not sublet, no cause of action could be stated against him for any compensation to respondent for any damages, if such there were, sustained by the latter by reason of such subletting. Moreover, the subletting was voluntary, intentional, and so deliberate as to be evidenced by a carefully drawn written instrument. In these circumstances it would be impossible to treat it as otherwise than ''willful''. Obviously, then, the breach of condition is not one against which equity can relieve, but

is rather of the class excepted by section 3275, *supra,* from those from which relief is permissible.

■ It has even been said that equity will not enforce a forfeiture even though the case be one in which no equitable relief against the forfeiture would be granted. (*Harrison* v. *Woodward,* 11 Cal. App. 15, 22, 23 [103 Pac. 933].) While, however, as already observed, the complaint in the instant case seeks, in one of its counts, to quiet the respondents' title and is, therefore, as to that count, in some sort a bill in equity, yet it is such only in a limited sense, since actions to quiet title are authorized by section 738 of the Code of Civil Procedure and governed by its provisions. In an action to quiet title, therefore, where the case involves a purported forfeiture, what the court is in reality asked to do is not to alter the existing status but to declare it. If the forfeiture has occurred, it has already taken place without any action on the court's part. The court's duty is merely to determine the fact. That is a duty which, in the light of section 738, *supra,* may not be declined. The general rule that equity will not enforce a forfeiture does not apply.

■ It may perhaps be urged that, even though the inhibition against subletting be held, as we have held it, to be a condition binding as such upon Warren, and one of a class against which equity may not generally relieve, yet in this instance the breach was not a substantial one. Although his contention is not made in precisely that language, appellant's counsel does direct our attention to *McNeece* v. *Wood,* 204 Cal. 280 [267 Pac. 877], in which it was, *inter alia,* said (p. 284) that: "the equities of the case do not call for the drastic remedy of forfeiture under the facts presented", and he seeks generally to show in the instant case that the making of the sublease to Brooks was in aid of the purposes for which the original lease was granted, or that by reason of Warren's retention of the right to supervise the conduct of the aviation field, the making of the sublease was not of sufficient importance as a departure from what the basic lease required as to call for such drastic action as that which respondent has here sought and, in the trial court, obtained. *McNeece* v. *Wood, supra,* however, is essentially distinguishable in its facts. There what was relied on as the ground of forfeiture consisted of two violations of the requirement in the lease that the lessee permit no unlawful acts on the leased

premises. It was shown that two such acts had occurred without the tenant's knowledge, though he was held to have taken every precaution against their occurrence. In the instant case, however, on the contrary, as already observed, the breach complained of was definitely a willful act on appellant's part within the meaning of the term "willful" as used in section 3275 of the Civil Code. In these circumstances we do not think it would have been competent for the trial court to undertake to measure the degree of departure which the making of the sublease to Brooks tended to bring about or did bring about from the plan for the operation of the aviation field which the basic lease contemplated. It is enough that the original lessors, for reasons satisfactory to themselves, stipulated in effect that nobody, other than Warren, purporting to hold any sublease of the property, should have anything to do with it as a lessee. Whether some arrangement other and different from that ought to have been satisfactory to the Evans, to the bank, or to respondents as their grantees, is a matter which they must decide. The courts are not authorized to substitute their judgment on the subject.

We think that what we have said necessarily disposes of the other contention on behalf of appellant Warren that the trial court erred in rejecting his offer to prove that he, after his arrangement with Brooks, continued to act as manager of the premises, and we furthermore think that, so far as Warren was concerned, there was no error committed in rejecting his offer to prove that it is inequitable from the standpoint of the public interest to declare the basic lease forfeited. The circumstance that defendants set up in their answers what they claim the facts to have been in these particulars makes no difference. Irrelevant matter, though pleaded, is still irrelevant. So far as public interest is concerned, the City of Riverside appears to be the only authorized representative of such interest made a party to the action and it has not appealed from the judgment. We do not think that phase of the case one which appellant Warren was or is entitled to litigate. It is probably true that having rejected the evidence which appellant proffered on this latter subject, the trial court ought not to have gone on and made findings upon it adverse to appellant's allegations, or to have made any findings with respect to the public interest at all.

In so far as appellant is concerned, these findings are as irrelevant to anything requiring decision as are the issues which he tendered on the subject. Being irrelevant, however, such findings can have done no harm.

There is nothing in the claim that the court was not authorized to award the $350 money judgment against Warren. Regardless of what his status was, he continued, after the basic lease had been forfeited, to be at least one of the occupants of the premises and declined to vacate them after due notice requiring him to do so.

The judgment is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 21, 1938.